Brent D. SHARP, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 18A02–0501–CR–30.

Court of Appeals of Indiana.

Oct. 25, 2005.

See also 807 N.E.2d 765.

Michael P. Quirk, Muncie, for Appellant.

Steve Carter, Attorney General of Indiana, Jodi Kathryn Stein, Deputy Attorney General, Indianapolis, for Appellee.

## OPINION

BAKER, Judge.

Appellant-defendant Brent D. Sharp appeals his convictions for two counts of Burglary,[1] a class A felony, Rape,[2] a class B felony, Criminal Confinement,[3] a class D felony, Criminal Deviate Conduct,[4] a class A felony, Child Molesting,[5] a class A felony, and Criminal Confinement,[6] a class C felony. Specifically, Sharp claims that the trial court erred in ordering Sharp to provide a DNA sample because there was "no probable cause or reasonable suspicion" for the trial court to have ordered the sample. Appellant's Br. p. 2. Sharp also argues that his trial counsel was ineffective for failing to object to the use of the DNA evidence at trial. Concluding that Sharp has failed to show that his Fourth Amendment rights under the United States Constitution were violated with regard to the DNA sample, and further observing that Sharp's trial counsel was not ineffective, we affirm the judgment of the trial court.

## FACTS

In December 2002, Tyjuana Thompson was living in Muncie with her two daughters, fourteen-year-old J.L., and nine-year-old A.L. On the evening of December 13, Thompson left for work around 10:00 p.m. After J.L. went to bed approximately one-half hour later, she woke up at some point and felt a sensation on her leg. Looking at the doorway, J.L. noticed a man who she initially thought was her cousin, Christopher, who had been released from prison a few months earlier. Christopher also lived next door to Thompson. The man, who wore a tan coat and a ski mask that covered his face, was subsequently identified as Sharp. Sharp approached J.L. and began to choke her. When J.L. began to fight, Sharp choked her harder and smothered her face with a pillow. Sharp then removed J.L.'s shorts and underwear and inserted his penis into her vagina. At some point during the assault, J.L. lost consciousness.

When J.L. awoke, she was lying on the floor, cross-legged, and her arms were bound with duct tape behind her back. Her mouth was also covered with tape, and she was wearing only a t-shirt. Eventually, J.L. crawled into her sister's room, where A.L. was able to remove the duct tape. The girls then called Thompson at work and told her about the incident.

1. Ind.Code § 35–43–2–1.

2. Ind.Code § 35–42–4–1(a)(1).

3. I.C. § 35–42–3–3(a)(1).

4. I.C. § 35–42–4–2(a)(1).

5. I.C. § 35–42–4–3(b)(2).

6. I.C. § 35–42–3–3(a)(1).

The police were notified, and J.L. was transported to Ball Memorial Hospital in Muncie, where a sexual assault evidence examination was performed. During the examination of J.L., Dr. Max Rudicel found evidence of forced penetration. Indiana State Police forensic scientist Karen Bruewer analyzed the evidence and discovered sperm on the vaginal and cervical slides and swabs, the external genital swabs, and the vaginal wash. She forwarded this evidence to the Indiana State Police in Lowell, where forensic DNA analyst Nicole Ihnat prepared DNA profiles. It was determined that J.L.'s cousin, Christopher, was eliminated as a contributor of the sperm. Moreover, an initial search in the Indiana DNA database produced no matches.

On the evening of May 22, 2003, Jessica Woolums was babysitting for her six young cousins at a Muncie residence. After Jessica helped her seven-year-old cousin, C.W., do her homework, they fell asleep in the living room with the other children. At some point, a man wearing a bandana and winter hat entered the house, picked up C.W., and carried her to a back room of the residence. The man, who was subsequently identified as Sharp, asked C.W. how old she was. After C.W. replied that she was seven years old, Sharp, who was armed with a knife, removed C.W.'s clothing. He then choked C.W. to the point of unconsciousness. When she awoke, Sharp carried C.W. to the kitchen, where he inserted his penis into her anus and attempted to insert his penis into her vagina. Sharp then carried C.W. into the dining room where he again sexually assaulted her. Apparently, Jessica and the other children slept through this episode.

After Sharp left the residence, C.W. and Jessica went next door for help. The police were contacted, and C.W. was eventually transported to Ball Memorial Hospital,

where two sexual assault evidence kits were taken. Dr. Rudicel observed that C.W. had been choked, and Dr. Lopiccolo noticed a tear to C.W.'s anus, evidence of forced penetration, and a white opaque cloudy material in C.W.'s rectum. Bruewer, the Indiana State Police forensic scientist, analyzed the evidence and discovered the presence of semen on both the rectal swab and the rectal smear slide.

Prior to these incidents, Sharp had been convicted of burglary in 1999, was sentenced to a three-year suspended sentence and was placed on probation until December 2, 2002, for that offense. In June 2003, Sharp's probation officer filed a petition to revoke probation, alleging that Sharp had failed to meet various conditions of probation that had been imposed upon him. Although the probation officer was aware of Sharp's violations when they occurred, the deputy prosecutor did not file the petition to revoke until June 2003, long after Sharp's probation had ended. As a consequence, on August 21, 2003, Sharp moved to dismiss the petition on the grounds that it had not been timely filed. The trial court denied the motion on August 25, 2003, placed Sharp back on probation, and ordered Sharp to provide a DNA sample. Prior to his release from the jail, Sharp submitted a DNA sample that was subsequently entered into the State's DNA database. Sharp provided the DNA sample in accordance with a nunc pro tunc order entered on September 16, 2003. This order stated that Sharp's DNA sample should have been taken when he was convicted of burglary in 1999, and that his DNA should have already been included in the database.

During the course of the investigation of the above incidents, the police department requested neighbors and family members of the victims to submit to voluntary DNA testing. Also, on September 12, 2003, a

search was conducted in the DNA database, where it was determined that the DNA profile in J.L.'s case matched the DNA of Sharp, whose sample had been entered into the database in accordance with the trial court's order regarding the burglary offense and the probation revocation. Four days later, Nicole Ihnat prepared DNA profiles from the evidence that was gathered from the incident involving C.W. The DNA profile generated from the seminal material found on the rectal slide in C.W.'s case matched that of Sharp, who lived next door to C.W.

Thereafter, on October 3, 2003, Sharp was charged with the above offenses. He then filed a motion to suppress the DNA evidence, contending that the sample had been obtained in violation of the Fourth Amendment to the United States Constitution as well as Article 1, Section 11 of the Indiana Constitution. In ruling on Sharp's motion, the trial court observed that Sharp's DNA sample had been taken pursuant to the nunc pro tunc order that had been issued.

Sharp then appealed the revocation of his probation in the burglary case, and we determined that the petition to revoke probation had not been timely filed because three of the bases that the State alleged to support the petition occurred after the probationary period had ended. *See* *Sharp v. State*, 807 N.E.2d 765, 767 (Ind. Ct.App.2004). In our opinion that was handed down on May 3, 2004, we observed that

> Because the probation officer knew of the violations for which the trial court revoked Sharp's probation but did not file a petition to revoke until seven months after Sharp's probationary period ended, we find that the petition should have been dismissed as untimely.

*Id.* at 768. We further found that Sharp's challenge to the constitutionality of Indiana Code section 10–13–6–10,[7] the statute governing and creating Indiana's DNA database, was waived because he did not make a proper objection in the trial court. *Id.*

In this case, after a hearing on Sharp's motion to suppress, the trial court denied the motion on November 16, 2004, and adopted the order that another trial court judge in Delaware County Circuit Court 3 had issued when Sharp presented the same issues regarding the admissibility of

---

7. This statute, entitled "Convicted felons to provide DNA sample" provides as follows:

Sec. 10. (a) This section applies to the following:

(1) A person convicted of a felony under IC 35–42 (offenses against the person), IC 35–43–2–1 (burglary), or IC 35–42–4–6 (child solicitation):

(A) after June 30, 1996, whether or not the person is sentenced to a term of imprisonment; and

(B) before July 1, 1996, if the person is held in jail or prison on or after July 1, 1996.

(2) A person convicted of a criminal law in effect before October 1, 1977, that penalized an act substantially similar to a felony described in IC 35–42 or IC 35–43–2–1 or that would have been an included offense of a felony described in IC 35–42 or IC 35–43–2–1 if the felony had been in effect:

(A) after June 30, 1998, whether or not the person is sentenced to a term of imprisonment; and

(B) before July 1, 1998, if the person is held in jail or prison on or after July 1, 1998.

(b) A person described in subsection (a) shall provide a DNA sample to the:

(1) department of correction or the designee of the department of correction if the offender is committed to the department of correction; or

(2) county sheriff or the designee of the county sheriff if the offender is held in a county jail or other county penal facility, placed in a community corrections program (as defined in IC 35–38–2.6–2), or placed on probation. A convicted person is not required to submit a blood sample if doing so would present a substantial and an unreasonable risk to the person's health.

DNA evidence. In particular, the trial court in both cases determined that Sharp was collaterally estopped from relitigating the constitutionality of the taking of his DNA sample because that issue had already been litigated in the appeal from the probation revocation. Appellant's App. p. 75–76; 176. Also, as the State pointed out in its response to Sharp's motion to suppress:

> 3. The Defendant appealed the seizure of his blood under Cause # 18D02–9902–CF–13. The Court of Appeals affirmed that portion of the trial court's decision requiring Defendant to submit a blood sample. *Sharp v. State*, 807 N.E.2d 765 (Ind.App. 2004). The Defendant had a full and fair opportunity to litigate the issue in that case. Any attempt, in this case, to attack the acquisition of Defendant's blood sample out of 18D02–9902–CF–13 is prohibited by the doctrines of *res judicata* and collateral estoppel.
>
> 4. Additionally, in the Delaware Circuit Court 3, *State of Indiana v. Brent Sharp*, 18C03–0310–FA–19, the defendant filed a Motion to Suppress that is identical to the Motion filed in the case at bar. The Delaware Circuit Court 3 Court denied the defendant's motion. In the Circuit Court 3 case, the defendant attempted to relitigate the same issues as raised in Delaware Circuit Court 2 and the Indiana Court of Appeals, just as he is attempting in the case at bar. The Delaware Circuit Court 3 held that the doctrine of collateral

estoppel prohibited the Defendant from relitigating.

Appellant's App. p. 71–72.

When the jury trial commenced in this case, Sharp did not object to testimony that the DNA taken from each of the victims matched his DNA in the Indiana database. Rather, Sharp lodged an objection to the fact that the confirmatory DNA sample taken from him matched the DNA that was taken from the victims. The jury ultimately convicted Sharp of all charged offenses, and the jury found a total of thirty-eight aggravating factors. In the end, Sharp was sentenced to an aggregate term of 220 years. He now appeals.

## DISCUSSION AND DECISION

### A. Argument Regarding the Constitutionality of the DNA Statutes

Sharp first maintains that the trial court should not have admitted the DNA evidence at trial. In particular, Sharp contends that the statutes applying to Indiana's DNA database should be declared unconstitutional, inasmuch as there was no probable cause or reasonable suspicion for the trial court to have ordered a DNA sample taken from him. Therefore, Sharp argues that the taking of the DNA sample violated his right to be free from unreasonable search and seizure.[8]

As set forth above, Sharp submitted a DNA sample for entry into the Indiana DNA database in September of 2003, as a result of the nunc pro tunc order that had been issued. In those prior proceedings,

---

**8.** While Sharp makes the statement that "the taking of DNA samples is a search under ... Article 1, Section 11 of the Indiana Constitution," appellant's br. p. 9, he fails to advance any argument in support of his claim that the evidence should have been suppressed on this basis. As a result, the argument is waived.

*See Albrecht v. State*, 737 N.E.2d 719, 726 (Ind.2000) (holding that the defendant's argument was waived when he failed to present a cogent argument on appeal challenging the trial court's basis for excluding certain evidence).

Sharp challenged the propriety of the seizure of his blood in accordance with Indiana Code section 10–13–6–10, and presented that issue to this court on appeal. We determined that Sharp had waived this issue by not presenting it at the trial court level. *Sharp*, 807 N.E.2d at 768. In light of that determination, the hurdle that Sharp must overcome in this case is whether he can now present that same issue.

■ Generally, the doctrine of collateral estoppel operates to bar subsequent relitigation of an issue or fact where that issue or fact was necessarily adjudicated in a former lawsuit and is then presented in a subsequent lawsuit. *Reid v. State*, 719 N.E.2d 451, 454–55 (Ind.Ct.App.1999). We have applied this doctrine in a variety of contexts in criminal cases, and the "prime consideration is whether the party against whom the prior judgment is pled had a full and fair opportunity to litigate the issue and whether it would otherwise be unfair under the circumstances to permit the use of collateral estoppel." *Id.* at 456.

As noted above, Sharp litigated the constitutionality of the taking of his DNA that was placed in the database in the prior case, and he presented that issue in the prior appeal. Hence, we can only conclude that Sharp had the full and fair opportunity to litigate the issue he raises here, and the doctrine of collateral estoppel precludes him from relitigating the issue now.

■ Estoppel notwithstanding, we note that in *Balding v. State*, 812 N.E.2d 169 (Ind.Ct.App.2000), this court squarely addressed the issue that Sharp presents today regarding the constitutionality of the DNA statutes. Specifically, in *Balding*, the State filed a motion to compel the defendant to submit a DNA sample to be included in the state's database following a revocation of probation. *Id.* at 170. In

affirming the trial court's grant of the State's motion, we observed that "the compulsory collection of DNA samples from convicted offenders for inclusion in the Indiana DNA Database falls within the 'special needs' exception to the Fourth Amendment." *Id.* at 173. We also noted that when the State requested Balding to submit a DNA sample, "Balding had just been discharged from probation and sentenced to serve the suspended portion of his sentence because he violated probation." *Id.* Thus, we concluded that Balding's reasonable expectation of privacy was greatly reduced, and the character of the intrusion into Balding's privacy was minimal "because the procedure itself was non-invasive and pain free," and the State had a substantial interest in creating a DNA database. *Id.* We follow that rationale here and similarly conclude that there was no Fourth Amendment violation with respect to the DNA that was taken in these circumstances.

■ As for Sharp's challenge to the comparison of the DNA taken from the victims to his DNA profile in the database, we again observe that his DNA profile was submitted to the Indiana DNA database in 2003 following his conviction for burglary. Since that time, there has been no seizure or invasion of Sharp's privacy for which a warrant or probable cause was required. While Sharp had a legitimate expectation of privacy in his DNA sample at the time it was taken in 2003, he litigated that issue in that particular proceeding. And, as our Supreme Court recognized in *Smith v. State*, 744 N.E.2d 437 (Ind.2001), once DNA is used to create a profile, the individual has no possessory or ownership interest in it. In *Smith*, the defendant's DNA was extracted and a profile was created in an unrelated criminal proceeding. That DNA profile was later compared to blood found at the scene of the crimes, and

the DNA matched that of Smith. *Id.* at 438–39. When Smith moved to suppress the DNA evidence that linked him to the crimes it was observed on interlocutory appeal that:

> We agree with several courts that have held that, once DNA is used to create a profile, the profile becomes the property of the Crime Lab. Thus, Smith had no possessory or ownership interest in it. Nor does society recognize an expectation of privacy in records made for public purposes from legitimately obtained samples. As the Court of Appeals pointed out, courts from other jurisdictions have held that the comparison of a DNA profile with other DNA evidence from a database does not violate the Fourth Amendment. We agree.

*Id.* at 439. Following the reasoning set forth above, we can only conclude that Sharp's privacy interests were not implicated in this case. As a result, we affirm the judgment of the trial court on this issue.

## II. Ineffective Assistance of Counsel

■ In a related argument, Sharp is apparently attacking the effectiveness of his trial counsel. From what we can glean from his appellate brief, Sharp is contending that his trial counsel should have objected to the DNA evidence on the basis that the probation revocation proceeding, during which the trial court in the prior proceeding issued the nunc pro tunc order requiring him to submit his DNA sample, was untimely.

When evaluating a claim of ineffective assistance of counsel, we apply the two-part test articulated in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See Johnson v. State,* 832 N.E.2d 985, 996 (Ind.Ct.App. 2005). First, the defendant must show that counsel's performance was deficient. *Johnson,* 832 N.E.2d at 996. This requires a showing that counsel's representation fell below an objective standard of reasonableness, *id.,* and that the errors were so serious that they resulted in a denial of the right to counsel guaranteed to the defendant by the Sixth and Fourteenth Amendments. *See id.* Second, the defendant must show that the deficient performance resulted in prejudice. *Id.* To establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* To prevail on a claim of ineffective assistance of counsel because of a failure to object, a defendant must prove that an objection would have been sustained if made and that he was prejudiced by the failure. *Polk v. State,* 822 N.E.2d 239, 250 (Ind.Ct.App.2005), *trans. denied.*

In this case, the nunc pro tunc order that had been issued in the prior case provided that Sharp had already been convicted of a felony that required him to provide a DNA sample in accordance with Indiana Code section 10–1–9–10,[9] and that his "DNA should have already been included in the data base." Appellant's App. p. 106. To be sure, the statute required Sharp, who had been convicted of Burglary in the Delaware Circuit Court, to submit a DNA sample for inclusion in the database.

Contrary to Sharp's argument, the order was not related to the untimely probation revocation proceeding and Sharp was not ordered to provide his DNA sample because he was found to have violated the conditions of his probation. Hence, the untimely nature of that proceeding had no

**9.** This statute is currently codified as Indiana Code section 10–13–6–10.

effect upon the validity of the nunc pro tunc order. As a result, any objection by Sharp's defense counsel to the taking of his client's DNA pursuant to the nunc pro tunc order would not have been sustained by the trial court. Therefore, Sharp does not prevail on his ineffective assistance of counsel argument.

The judgment of the trial court is affirmed.

RILEY, J., and MATHIAS, J., concur.