## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 30 2015, 7:50 am

CLERK
of the supreme court,
court of appeals and
tax court

| | |
|---|---|
| **APPELLANT, PRO SE** | **ATTORNEY FOR APPELLEE** |
| Brent D. Sharp | Gregory F. Zoeller |
| Wabash Valley Correctional Facility | Attorney General of Indiana |
| Carlisle, Indiana | |
| | Jodi Kathryn Stein |
| | Deputy Attorney General |
| | Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Brent D. Sharp, | November 30, 2015 |
| *Appellant-Petitioner,* | Court of Appeals Case No. 18A02-1410-PC-728 |
| v. | Appeal from the Delaware Circuit Court |
| State of Indiana, | Trial Court Cause No. 18C02-1306-FA-10 |
| *Appellee-Defendant.* | The Honorable Kimberly Dowling, Judge |

**Pyle, Judge.**

## Statement of the Case

[1] Appellant/Petitioner, Brent D. Sharp ("Sharp"), appeals the trial court's denial of his petition for post-conviction relief, in which he requested relief from his

convictions for two counts of Class A felony burglary resulting in bodily injury and one count each of: Class B felony rape; Class D felony criminal confinement; Class A felony criminal deviate conduct; Class A felony child molesting; and Class C felony criminal confinement.

[2] Sharp was convicted after DNA taken from the victims of the above offenses matched his DNA sample in Indiana's DNA database. On direct appeal, Sharp's appellate counsel contested the submission of Sharp's DNA sample into the DNA database and argued that Sharp's trial counsel had been ineffective for failing to object to the admission of the DNA sample evidence at trial. This Court held that Sharp was collaterally estopped from challenging the submission of the DNA sample because he had previously litigated the issue in another cause. For the same reason, we held that Sharp's trial counsel was not ineffective for failing to object to the DNA evidence at trial.

[3] Sharp, pro se, then filed a petition for post-conviction relief. In his petition, he argued that his appellate counsel was ineffective for failing to raise several additional claims of trial counsel ineffectiveness on appeal and for failing to present an issue competently. Sharp asserts that his appellate counsel should have raised that his trial counsel rendered ineffective assistance by failing to: (1) request a change of judge; (2) request a severance of the charges against Sharp; (3) object to the State's questions about the Indiana DNA database and a witness's reference to Sharp as a convicted offender; (4) object to the admission of evidence of Sharp's DNA sample at trial; and (5) object to improper aggravating factors upon sentencing. Sharp also argued that his appellate

counsel failed to present his ineffective assistance of trial counsel argument competently on appeal. The post-conviction court denied Sharp's petition.

[4] On appeal, Sharp argues that the post-conviction court erred in finding that he had received effective assistance on each of the above issues. Because we do not find that Sharp met his burden on post-conviction, we affirm the post-conviction court's denial of his petition for post-conviction relief.

[5] We affirm.

## Issue

Whether Sharp's appellate counsel provided ineffective assistance.

## Facts

[6] We stated the facts underlying Sharp's conviction in our opinion on his direct appeal as follows:

> In December 2002, Tyjuana Thompson was living in Muncie with her two daughters, fourteen-year-old J.L.[] and nine-year-old A.L. On the evening of December 13, Thompson left for work around 10:00 p.m. After J.L. went to bed approximately one-half hour later, she woke up at some point and felt a sensation on her leg. Looking at the doorway, J.L. noticed a man who she initially thought was her cousin, Christopher, who had been released from prison a few months earlier. Christopher also lived next door to Thompson. The man, who wore a tan coat and a ski mask that covered his face, was subsequently identified as Sharp. Sharp approached J.L. and began to choke her. When J.L. began to fight, Sharp choked her harder and smothered her face with a pillow. Sharp then removed J.L.'s

shorts and underwear and inserted his penis into her vagina. At some point during the assault, J.L. lost consciousness.

When J.L. awoke, she was lying on the floor, cross-legged, and her arms were bound with duct tape behind her back. Her mouth was also covered with tape, and she was wearing only a t-shirt. Eventually, J.L. crawled into her sister's room, where A.L. was able to remove the duct tape. The girls then called Thompson at work and told her about the incident.

The police were notified, and J.L. was transported to Ball Memorial Hospital in Muncie, where a sexual assault evidence examination was performed. During the examination of J.L., Dr. Max Rudicel found evidence of forced penetration. Indiana State Police forensic scientist Karen Bruewer analyzed the evidence and discovered sperm on the vaginal and cervical slides and swabs, the external genital swabs, and the vaginal wash. She forwarded this evidence to the Indiana State Police in Lowell, where forensic DNA analyst Nicole Ihnat prepared DNA profiles. It was determined that J.L.'s cousin, Christopher, was eliminated as a contributor of the sperm. Moreover, an initial search in the Indiana DNA database produced no matches.

On the evening of May 22, 2003, Jessica Woolums was babysitting for her six young cousins at a Muncie residence. After Jessica helped her seven-year-old cousin, C.W., do her homework, they fell asleep in the living room with the other children. At some point, a man wearing a bandana and winter hat entered the house, picked up C.W., and carried her to a back room of the residence. The man, who was subsequently identified as Sharp, asked C.W. how old she was. After C.W. replied that she was seven years old, Sharp, who was armed with a knife, removed C.W.'s clothing. He then choked C.W. to the point of unconsciousness. When she awoke, Sharp carried C.W. to the kitchen, where he inserted his penis into her anus and attempted to insert his penis into her vagina. Sharp then carried C.W. into the dining room where he again sexually assaulted her. Apparently, Jessica and the other children slept through this episode.

After Sharp left the residence, C.W. and Jessica went next door for help. The police were contacted, and C.W. was eventually transported to Ball Memorial Hospital, where two sexual assault evidence kits were taken. Dr. Rudicel observed that C.W. had been choked, and Dr. Lopiccolo noticed a tear to C.W.'s anus, evidence of forced penetration, and a white opaque cloudy material in C.W.'s rectum. Bruewer, the Indiana State Police forensic scientist, analyzed the evidence and discovered the presence of semen on both the rectal swab and the rectal smear slide.

Prior to these incidents, Sharp had been convicted of burglary in 1999, was sentenced to a three-year suspended sentence and was placed on probation until December 2, 2002, for that offense. In June 2003, Sharp's probation officer filed a petition to revoke probation, alleging that Sharp had failed to meet various conditions of probation that had been imposed upon him. Although the probation officer was aware of Sharp's violations when they occurred, the deputy prosecutor did not file the petition to revoke until June 2003, long after Sharp's probation had ended. As a consequence, on August 21, 2003, Sharp moved to dismiss the petition on the grounds that it had not been timely filed. The trial court denied the motion on August 25, 2003, placed Sharp back on probation, and ordered Sharp to provide a DNA sample. Prior to his release from the jail, Sharp submitted a DNA sample that was subsequently entered into the State's DNA database. Sharp provided the DNA sample in accordance with a nunc pro tunc order entered on September 16, 2003. This order stated that Sharp's DNA sample should have been taken when he was convicted of burglary in 1999, and that his DNA should have already been included in the database.

During the course of the investigation of the above incidents, the police department requested neighbors and family members of the victims to submit to voluntary DNA testing. Also, on September 12, 2003, a search was conducted in the DNA database, where it was determined that the DNA profile in J.L.'s

case matched the DNA of Sharp, whose sample had been entered into the database in accordance with the trial court's order regarding the burglary offense and the probation revocation. Four days later, Nicole Ihnat prepared DNA profiles from the evidence that was gathered from the incident involving C.W. The DNA profile generated from the seminal material found on the rectal slide in C.W.'s case matched that of Sharp, who lived next door to C.W.

Thereafter, on October 3, 2003, Sharp was charged with [Count 1, Class A felony burglary resulting in bodily injury; Count 2, Class B felony rape; Count 3, Class D felony criminal confinement; Count 4, Class A felony burglary resulting in bodily injury; Count 5, Class A felony criminal deviate conduct; Count 6, Class A felony child molesting; and Count 7, Class C felony criminal confinement.] He then filed a motion to suppress the DNA evidence, contending that the sample had been obtained in violation of the Fourth Amendment to the United States Constitution as well as Article 1, Section 11 of the Indiana Constitution. In ruling on Sharp's motion, the trial court observed that Sharp's DNA sample had been taken pursuant to the nunc pro tunc order that had been issued.

Sharp then appealed the revocation of his probation in the burglary case, and we determined that the petition to revoke probation had not been timely filed because three of the bases that the State alleged to support the petition occurred after the probationary period had ended. *See Sharp v. State,* 807 N.E.2d 765, 767 (Ind. Ct. App. 2004). In our opinion that was handed down on May 3, 2004, we observed that[:]

> Because the probation officer knew of the violations for which the trial court revoked Sharp's probation but did not file a petition to revoke until seven months after Sharp's probationary period ended, we find that the petition should have been dismissed as untimely.

*Id.* at 768. We further found that Sharp's challenge to the constitutionality of Indiana Code section 10–13–6–10, the statute

governing and creating Indiana's DNA database, was waived because he did not make a proper objection in the trial court. *Id.*

In this case, after a hearing on Sharp's motion to suppress, the trial court denied the motion on November 16, 2004, and adopted the order that another trial court judge in Delaware County Circuit Court 3 had issued when Sharp presented the same issues regarding the admissibility of DNA evidence. In particular, the trial court in both cases determined that Sharp was collaterally estopped from relitigating the constitutionality of the taking of his DNA sample because that issue had already been litigated in the appeal from the probation revocation. Also, as the State pointed out in its response to Sharp's motion to suppress:

> 3. The Defendant appealed the seizure of his blood under Cause # 18D02–9902–CF–13. The Court of Appeals affirmed that portion of the trial court's decision requiring Defendant to submit a blood sample. *Sharp v. State*, 807 N.E.2d 765 ([Ind. Ct. App. 2004]). The Defendant had a full and fair opportunity to litigate the issue in that case. Any attempt, in this case, to attack the acquisition of Defendant's blood sample out of 18D02–9902–CF–13 is prohibited by the doctrines of *res judicata* and collateral estoppel.
>
> 4. Additionally, in the Delaware Circuit Court 3, *State of Indiana v. Brent Sharp*, 18C03–0310–FA–19, the [D]efendant filed a Motion to Suppress that is identical to the Motion filed in the case at bar. The Delaware Circuit Court 3 Court denied the [D]efendant's motion. In the Circuit Court 3 case, the [D]efendant attempted to relitigate the same issues as raised in Delaware Circuit Court 2 and the Indiana Court of Appeals, just as he is attempting in the case at bar. The Delaware Circuit Court 3 held that the doctrine of collateral estoppel prohibited the Defendant from relitigating.

*Sharp v. State*, 835 N.E.2d 1079, 1081-83 (Ind. Ct. App. 2005) (internal citations and footnotes omitted).

[7] The trial court held a jury trial on the charges against Sharp on November 29, 2004 through December 1, 2004. At the conclusion of the trial, the jury found Sharp guilty as charged. Then, in a hearing after the trial, the jury found the existence of thirty-eight (38) aggravating factors.

[8] On December 23, 2004, the trial court held a sentencing hearing. It adopted five of the aggravating factors the jury had found into its sentencing order. These factors were: (1) the seriousness and number of Sharp's prior crimes, which included a Class C felony conviction for burglary, two Class A misdemeanor convictions for residential entry, and six Class A misdemeanor convictions for check deception; (2) Sharp was "in need of correctional or rehabilitative treatment that [could] best be provided by commitment to a penal facility;" (3) one of the victims had been seven years old at the time the crime occurred; (4) Sharp had committed the offenses in the presence of or hearing of people that were less than eighteen years old—specifically, A.L. and C.W.'s younger sisters; and (5) Sharp's crime had affected the public at large since he had chosen to enter strangers' homes at night and had targeted weaker members of the community. (State's Ex. 3 at 9). The trial court also found that there were two mitigating factors: (1) Sharp had some family support that could aid in his rehabilitation; and (2) incarceration might cause undue hardship on Sharp's dependents. However, the trial court noted that it assigned the mitigating factors "minimal weight." (State's Ex. 3 at 9).

[9]  Based on the aggravators and mitigators, the trial court sentenced Sharp to: (1) fifty (50) years for his Class A felony burglary resulting in bodily injury conviction; (2) twenty (20) years for his Class B felony rape conviction; (3) three (3) years for his Class D felony criminal confinement conviction; (4) fifty (50) years for his Class A felony burglary resulting in bodily injury conviction; (5) fifty (50) years for his Class A felony criminal deviate conduct conviction; (6) fifty (50) years for his Class A felony child molesting conviction; and (7) eight (8) years for his Class C felony criminal confinement conviction. Except for Sharp's two criminal confinement sentences, the trial court ordered his sentences to be served consecutively, for an aggregate executed sentence of two hundred twenty (220) years.

[10]  Thereafter, Sharp appealed his convictions. On appeal, he argued that the trial court should not have admitted his DNA evidence at trial. *Sharp*, 835 N.E.2d at 1084. He asserted that the DNA was inadmissible because the statute governing Indiana's DNA database was unconstitutional and because the trial court did not have probable cause to order him to submit a DNA sample. *Id.* This Court found that Sharp had already disputed the constitutionality of requiring him to submit his DNA sample into the database when Sharp challenged the *nunc pro tunc* order requiring him to do so. *Id.* at 1084-85. As a result, we concluded that his argument was barred on the grounds of collateral estoppel. *Id.* at 1085. Nevertheless, we addressed the merits of Sharp's argument and determined that his constitutional rights had not been violated because the compulsory collection of DNA samples from convicted offenders

for inclusion in Indiana's DNA database fell within an exception to the Fourth Amendment's privacy protections. *Id.*

[11] Also on appeal, Sharp's appellate counsel argued that "[d]efense counsel should have objected to the DNA evidence being used because it was taken in an untimely manner and not in accordance with [INDIANA CODE §] 10-13-6-5 through [INDIANA CODE §] 10-13-6-10 and the recent decision of *Sharp v. State*, 807 N.E.2d (Ind. App. 2004)." (Sharp's Ex. A)[1] (improper case citation in original). In other words, his appellate counsel argued that, because the court ordered Sharp to submit the sample at the same time it revoked Sharp's probation and then the probation revocation was later found to be improper, Sharp's trial counsel should have objected to the admission of the DNA evidence at trial here. This Court interpreted this argument as an ineffective assistance of trial counsel claim. *Sharp*, 835 N.E.2d at 1086. We held that, because Sharp had already been convicted of a felony requiring him to provide a DNA sample for the DNA database at the time of his probation revocation, the order requiring him to do so was not related to the improper probation revocation. *Id.* As a result, we held that his trial counsel was not ineffective for failing to challenge the DNA sample. *Id.* at 1087.

---

[1] This passage is from Sharp's Appellant's Brief. Although the exhibit volume does not reflect that the Appellant's Brief was included as part of Sharp's Exhibit A, the transcript of the post-conviction hearing indicates that it was admitted as part of Exhibit A.

On May 13, 2013, Sharp filed a pro se amended petition for post-conviction relief.[2] In this petition, he alleged that his appellate counsel had been ineffective for failing to raise certain issues on appeal and for failing to competently present his ineffective assistance of trial counsel claim on appeal. On January 9, 2014, the post-conviction court held a hearing, at which Sharp's appellate and trial attorneys testified. Then, on September 25, 2014, the post-conviction court issued findings of fact and conclusions thereon denying Sharp post-conviction relief. Sharp now appeals. We will provide additional facts as necessary.

## Decision

On appeal, Sharp argues that the post-conviction court erred in denying his petition for post-conviction relief. He asserts that the court should have granted him relief because his appellate counsel provided ineffective assistance. Specifically, he claims that his appellate counsel: (1) failed to raise certain issues on appeal, including that Sharp's trial counsel was ineffective because he did not: (a) request a change of judge; (b) request a severance of the charges against him; (c) object to the State's questions about the Indiana DNA database and a witness's reference to Sharp's status as a convicted offender, both of which he claims notified the jury of his status as a convicted offender; (d) object to the admission of evidence regarding Sharp's DNA sample at trial; (e) object

---

[2] Sharp filed his original petition on November 2, 2012. In that petition, he alleged that his trial counsel had been ineffective. The State filed a motion for summary disposition, arguing that Sharp had already litigated the effectiveness of his trial counsel in his direct appeal. The post-conviction court granted the State's motion but granted Sharp leave to amend his petition.

to improper aggravating factors upon sentencing; and (2) failed to competently argue on appeal that Sharp's trial counsel was ineffective for failing to object to the admission of the evidence of his DNA sample.

[14] First, we must note that post-conviction proceedings afford petitioners a limited opportunity to raise issues that were unavailable or unknown at trial and on direct appeal. *Pannell v. State*, 36 N.E.3d 477, 485 (Ind. Ct. App. 2015). Such proceedings are not "super appeals" through which convicted persons can raise issues that they failed to raise at trial or on direct appeal. *Id.* The proceedings are civil in nature, and petitioners bear the burden of proving their grounds for relief by a preponderance of the evidence. *Id.*

[15] When a petitioner appeals a denial of post-conviction relief, he appeals from a negative judgment. *Id.* Consequently, we may not reverse the judgment of the post-conviction court unless the petitioner demonstrates that the evidence "'as a whole, leads unerringly and unmistakably to a decision opposite that reached by the post-conviction court.'" *Id.* (quoting *Allen v. State*, 791 N.E.2d 748, 752 (Ind. Ct. App. 2003), *trans. denied*). We accept the post-conviction court's findings of fact unless they are clearly erroneous, but we do not give deference to the court's conclusions of law. *Id.*

[16] Further, we must note that, although Sharp is proceeding pro se and lacks legal training, we hold pro se litigants to the same standards as trained counsel. *Id.*

[17] A defendant claiming a violation of the right to effective assistance of trial or appellate counsel must establish the two components set forth in *Strickland v.*

*Washington*, 466 U.S. 668 (1984). *Timberlake v. State*, 753 N.E.2d 591, 603 (Ind. 2001); *Reed v. State*, 856 N.E.2d 1189, 1195 (Ind. 2006) ("The standard of review for a claim of ineffective assistance of appellate counsel is the same as for trial counsel . . . ."). First, the defendant must show that counsel's performance was deficient. *Timberlake*, 753 N.E.2d at 603. This requires a showing that counsel's representation fell below an objective standard of reasonableness and that the errors were so serious that they resulted in a denial of the right to counsel guaranteed to the defendant by the Sixth Amendment. *Id.* Second, the defendant must show that the deficient performance prejudiced his defense. *Id.* To establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

[18] Counsel is afforded considerable discretion in choosing strategy and tactics, and we will accord those decisions deference. *Id.* A strong presumption arises that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Id.* The *Strickland* Court recognized that even the finest, most experienced criminal defense attorneys may not agree on the ideal strategy or the most effective way to represent a client. *Id.* Isolated mistakes, poor strategy, inexperience, and instances of bad judgment do not necessarily render representation ineffective. *Id.* The two prongs of the *Strickland* test are separate and independent inquiries. *Id.* Thus, "'[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of

sufficient prejudice . . . that course should be followed.'" *Id.* (quoting *Williams v. State*, 706 N.E.2d 149, 154 (Ind. 1999)).

Our supreme court has recognized three categories of alleged appellate counsel ineffectiveness: (1) denying access to an appeal, (2) failing to raise issues, and (3) failing to present issues competently. *Id.* at 604 (citing *Bieghler v. State*, 690 N.E.2d 188, 193-95 (Ind. 1997), *reh'g denied*, *cert. denied*). When a claim of ineffective assistance is directed at appellate counsel for failing to fully and properly raise and support a claim of ineffective assistance of trial counsel, a defendant faces a compound burden on post-conviction. *Id.* The post-conviction court must conclude that appellate counsel's performance was deficient and that, but for the deficiency of appellate counsel, trial counsel's performance would have been found deficient and prejudicial. *Id.*

Here, Sharp challenges his appellate counsel's performance under two of the above categories. First, he argues that his appellate counsel was ineffective for failing to raise several issues, and, second, he argues that his appellate counsel was ineffective for failing to present an issue competently. We will address each of these arguments in turn.

### 1. Failure to Raise Issues

Sharp asserts that his appellate counsel was ineffective because he failed to raise several issues that, according to Sharp, were better than the issues his counsel did raise. Specifically, Sharp claims that his appellate counsel should have argued that his trial counsel was ineffective for failing to: (1) request a change

of judge; (2) request severance of his charges; (3) object to the State's questions about the DNA database and a witness's reference to Sharp as a convicted offender; (4) object to the admission of evidence regarding Sharp's DNA sample at trial; and (5) object to improper aggravators during sentencing.

[22] In a claim that appellate counsel provided ineffective assistance regarding the selection and presentation of issues, the defendant must overcome the strongest presumption of adequate assistance, and judicial scrutiny is highly deferential. *Ben-Yisrayl*, 738 N.E.2d 253, 260-61. In such cases, we apply a two-part test. *Timberlake*, 753 N.E.2d at 605-06. First, we evaluate whether the unraised issues are significant and obvious from the face of the record and, second, whether the unraised issues are "'clearly stronger'" than the raised issues. *Id.* (quoting *Bieghler*, 690 N.E.2d at 198). Otherwise stated, to prevail on a claim of ineffective assistance of appellate counsel, "'a defendant must show from the information available in the trial record or otherwise known to appellate counsel that appellate counsel failed to present a significant and obvious issue and that this failure cannot be explained by any reasonable strategy.'" *Id.* (quoting *Ben-Yisrayl*, 738 N.E.2d at 261). Because the role and function of appellate counsel on direct appeal is different from that of the defendant's post-conviction counsel, we do not measure the appellate counsel's performance by information unknown to the appellate counsel but later developed after the appeal by the post-conviction counsel. *Ben-Yisrayl*, 738 N.E.2d at 261.

## A.  Change of Judge

[23]    First, Sharp argues that his appellate counsel should have argued that his trial counsel was ineffective for failing to move for a change of judge.  During a pre-trial conference, Sharp's trial judge informed the parties:

> [T]he victim whose first initial is J, I just recently found out that my daughter is acquainted with her, and I will have [defense counsel] explain.  I told counsel back in my office, explain[ed] to him the nature of the acquaintance.  So, if there's a need for that to be transferred, I don't see any reason that couldn't just be transferred to Circuit Court 3 to go with the other cases.

(Trial Tr. 21-22).[3]  The trial judge told Sharp's trial counsel to talk with Sharp, who was also at the pre-trial conference, about the issue and to tell her whether Sharp wanted her to transfer the case.  There is no record that Sharp's counsel thereafter told the judge that Sharp did not want to transfer the case.  Now, Sharp contends that the trial judge's pre-trial admission demonstrated that the judge was biased, and he correspondingly argues that his appellate counsel should have asserted that his trial counsel was ineffective for failing to file a motion for a change of judge.

---

[3] In order to distinguish between Sharp's trial transcript and post-conviction hearing transcript, we will refer to the trial transcript as "Trial Tr." and the post-conviction hearing transcript as "P-C Tr."  Similarly, we will refer to the Appendix from Sharp's direct appeal as "Appellate App." and the Appendix from his post-conviction hearing as "App."

[24] During his post-conviction hearing, Sharp asked his trial counsel whether he had given any consideration to asking the trial judge to recuse herself, and his trial counsel responded:

> I don't recall specifically what my thought process was then but with using the term "acquaintance[,]" it would have occurred to me that, that's not unusual that there would be some other knowledge of the next Judge that might know an alleged victim. It's just the way it works. So someone being an acquaintance and not even her but her daughter. I'm sort of guessing that it didn't seem to me at the time that, that would be significant or that would be an issue.

(P-C Tr. 31).

[25] As we stated above, in a claim such as Sharp's, a petitioner must prove that if it were not for his appellate counsel's performance, his trial counsel's performance would have been found deficient and prejudicial. *Timberlake*, 753 N.E.2d at 604. We conclude that Sharp's appellate counsel was not ineffective because, regardless of his performance, Sharp's trial counsel's performance would not have been found deficient and prejudicial on the grounds that he failed to request a change of judge.

[26] Specifically, it is apparent that his trial counsel's actions were a matter of trial strategy. When representing a defendant, "[c]ounsel is given 'significant deference in choosing a strategy which, at the time and under the circumstances, he or she deems best.'" *Benefield v. State*, 945 N.E.2d 791, 799 (Ind. Ct. App. 2011) (quoting *Potter v. State*, 684 N.E.2d 1127, 1133 (Ind.

1997)).  "'A reviewing court will not second-guess the propriety of trial counsel's tactics.'"  *Id.* (quoting *Davidson v. State*, 763 N.E.2d 441, 446 (Ind. 2002), *reh'g denied*, *cert. denied*).  "'[T]rial strategy is not subject to attack through an ineffective assistance of counsel claim, unless the strategy is so deficient or unreasonable as to fall outside of the objective standard of reasonableness.'"  *Id.* (quoting *Autrey v. State*, 700 N.E.2d 1140, 1141 (Ind. 1998)).  "'This is so even when such choices may be subject to criticism or the choice ultimately prove[s] detrimental to the defendant.'"  *Id.* (quoting *Autrey*, 700 N.E.2d at 1141).

[27]  Based on Sharp's trial counsel's testimony at the post-conviction hearing, it is clear that his trial counsel believed that it was equally likely a different judge might know one of the victims and also that Sharp's trial judge's daughter's acquaintance with the victim was so attenuated that it would not bias her determination.  Therefore, his trial counsel's decision was a matter of trial strategy and did not constitute deficient performance.  Further, we note that Sharp has not pointed to any specific incidences indicating that the trial judge might have been actually biased.  He merely raises the hypothetical argument that she could have been biased against him.  In light of these factors, we conclude that Sharp's appellate attorney was not ineffective for failing to raise a claim of ineffective assistance of trial counsel for failing to move for a change of judge.  Thus, the post-conviction court did not err in denying post-conviction relief on that claim.

## B. Severance of the Charges

[28] Next, Sharp argues that his appellate counsel was ineffective because he did not argue that Sharp's trial counsel was ineffective for failing to file a motion to sever Sharp's charges. Sharp notes that the charges against him involved two separate girls and two separate incidents that were not closely related in time. As a result, he claims that he had a right to severance and that the results of his trial might have been different if he had been granted a severance.

[29] Again, we conclude that Sharp's trial counsel's performance would not have been found deficient, regardless of his appellate counsel's performance. At the post-conviction hearing, Sharp's trial counsel said that he had considered filing a motion to sever the charges but concluded that, as a matter of strategy, he should not because both of the victims had identified people other than Sharp as the perpetrators of the crimes. Specifically, Sharp's trial counsel testified:

> I thought it may actually favor [Sharp] because you have two (2) people saying, at least initially, "no it wasn't him, I believe it was someone else or someone that [does not] fit his description[."] Isolated[,] in other words, if those trials were separate, that's just one factor where you have two (2) individuals, I think you have a strong case to point out to the jury. You know is this just a coincidence. How does this happen twice but yet they want you to think that this guy is guilty[?] So[,] I thought it might actually [] favor him to have those trials together.

(P-C Tr. 30-31).

[30] Sharp claims that this trial strategy was unreasonable because the DNA evidence established his identity, so the victims' identifications were "moot."

(Sharp's Br. 19). However, because the DNA evidence was the only evidence linking Sharp to the offenses, we conclude that it was logical for Sharp's trial counsel to attempt to call that identification into question through the evidence of the victims' contrary identifications. His decision was a reasonable strategic one, and we will not find his performance deficient. *See Perryman v. State*, 13 N.E.3d 923, 931 (Ind. Ct. App. 2014) ("'reasonable strategy is not subject to judicial second guesses.'") (quoting *Burr v. State*, 492 N.E.2d 306, 309 (Ind. 1986)), *trans. denied.* Accordingly, we conclude that Sharp did not meet his burden of proving that his appellate counsel provided ineffective assistance by failing to move for a severance of the charges.

### C. Failure to Object

[31] Next, Sharp argues that his appellate counsel should have argued that his trial counsel was ineffective for failing to object to: (1) the State's reference to the Indiana DNA database and a witness's reference to Sharp's status as a convicted offender; (2) the State's admission of evidence of his DNA sample at trial; and (3) the trial court's consideration of certain aggravating factors during sentencing. In order to prevail on a claim of ineffective assistance of counsel due to a failure to object, a defendant must show a reasonable probability that the objection would have been sustained if it were made. *Perryman v. State*, 13 N.E.3d 923, 931 (Ind. Ct. App. 2014) (quoting *Burr v. State*, 492 N.E.2d 306, 309 (Ind. 1986)), *trans. denied.*

### i. Convicted Offender

[32] At trial, the State questioned Nicole Ihnat ("Ihnat"), a forensic DNA analyst with the Indiana State Police Laboratory, about the DNA match between the DNA samples taken from the victims and Sharp's DNA sample stored in Indiana's DNA database, CODIS. The State asked Ihnat, "Who matched the profile that you entered into the CODIS data bank?" and she responded, "It was found to be consistent with a convicted offender sampled [sic] from Brent Sharp." (Trial Tr. 622). During its closing argument, the State then referred to CODIS again, stating "[i]t's not until September of '03 when we got the CODIS hit." (Trial Tr. 684). The State also said "it was Brent Sharp whose information DNA profile was in CODIS[.]" (Trial Tr. 685). Sharp now asserts that these references to his convicted offender status and CODIS, which is a database for the DNA of convicted offenders, prejudiced his trial by informing the jury that he had a criminal history. Accordingly, he contends that his appellate counsel should have argued that his trial counsel was ineffective for failing to object to those references.

[33] At Sharp's post-conviction hearing, his trial counsel testified that he did not remember the State's references to CODIS or to Sharp's status as a convicted offender, but he said that if he did not object, "something like that is often done for strategic reasons;" specifically, if a person "did [not] want to bring specific attention to it in that context." (P-C Tr. 35). In that case, his action would have been a legitimate strategic decision, and Sharp's appellate counsel would not be ineffective for failing to raise the issue on appeal. *See Connor v. State*, 711

N.E.2d 1238, 1250 (Ind. 1999) (holding that a defense counsel's avoidance of drawing attention to testimony or argument unfavorable to the defendant is a legitimate strategy), *reh'g denied*, *cert. denied*.

[34] Regardless, Sharp's trial counsel's failure to object to the challenged testimony was not prejudicial. As we stated above, to establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Timberlake*, 753 N.E.2d at 603. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* Here, there was DNA evidence directly linking Sharp to his offenses. As Ihnat stated, in the absence of an identical twin, Sharp was "the source of the DNA to a reasonable degree of scientific certainty." (Trial Tr. 626). In addition, Ihnat only mentioned that Sharp was a convicted offender on one occasion, and it was not in response to the State's question. Also, Sharp's trial counsel later attempted to cure the admission by asking Ihnat: "Now the CODIS database that you mentioned, those are not just sex offenders, right? That's anybody who has their profile in the database?" and she responded, "That is correct." (Trial Tr. 640). In light of all of these factors, it is unlikely that Ihnat's reference to Sharp's convicted offender status or the CODIS database prejudiced Sharp such that there was a reasonable probability the result of the proceeding would have been different. Thus, Sharp's appellate counsel was not ineffective for failing to argue that trial counsel should have objected to the statements, and

the post-conviction court did not err in finding that Sharp did not meet his burden of proving that he received ineffective assistance of counsel.

### ii.   DNA Sample

Next, Sharp asserts that his appellate counsel was ineffective because he did not argue on appeal that his trial counsel should have objected to "the DNA sample taken for inclusion in CODIS." (Sharp's Br. 21).  Sharp claims that the State did not present any evidence at trial that his sample was taken in a "medically approved manner" or that there was a chain of custody of the sample prior to its inclusion in the database.  (Sharp's Br. 21).

Both of these arguments again challenge the propriety of the inclusion of Sharp's DNA in the CODIS database, although on different grounds than he raised in his direct appeal.  First, we must note that Sharp's trial counsel did object to the "method or manner of obtaining the substances or the samples from Brent Sharp" at trial and was not successful.  (Trial Tr. 624).  Theoretically, the "method or manner" of obtaining the samples relates to both of Sharp's arguments here and, therefore, was addressed by his trial counsel, contrary to his contentions.  (Trial Tr. 624).

In addition, as we stated in his direct appeal, Sharp had already litigated the propriety of the DNA sample at the time of his trial, so he was precluded from collaterally attacking the manner that the evidence was submitted into CODIS. *See Sharp*, 835 N.E.2d at 1085 (finding that Sharp was collaterally estopped from re-litigating the submission of his DNA into CODIS).  Thus, Sharp's trial

counsel would not have been successful in objecting to the evidence of the DNA sample on either of the grounds that Sharp raises here and, accordingly, his appellate counsel was not ineffective for failing to raise the issue on appeal. *See Timberlake*, 753 N.E.2d at 603 (stating that a petitioner must demonstrate that counsel's performance was deficient, which requires a showing that "counsel's representation fell below an objective standard of reasonableness and that the errors were so serious that they resulted in a denial of the right to counsel guaranteed the defendant by the Sixth Amendment").

### iii.　Aggravating Factors

[38]　Finally, Sharp argues that his appellate counsel was ineffective because he did not assert that his trial counsel was ineffective for failing to object to the aggravating factors the trial court adopted during sentencing. Specifically, Sharp claims that his trial counsel should have objected to the trial court's consideration of: (1) his criminal history; (2) his "need for correctional or rehabilitative treatment that can best be provided by commitment to a penal facility;" (3) the victims' ages; (4) the fact that the crime was committed in the presence of or hearing of a person who was less than eighteen years old; and (5) the nature and circumstances of Sharp's offenses. (Appellate App. 446).

[39]　We need not address Sharp's arguments individually because we conclude that even if the trial court's aggravators were improper, Sharp has not shown that he was prejudiced by his counsel's failure to object. *See Timberlake*, 753 N.E.2d at 603 (stating that a petitioner must show that his counsel's performance prejudiced his defense in order to succeed on an ineffective assistance of counsel

claim). Sentencing determinations are within the trial court's discretion. *McCann v. State*, 749 N.E. 2d 1116, 1119 (Ind. 2001). At the time of Sharp's offense, if a trial court relied on aggravating or mitigating circumstances to enhance or reduce the presumptive sentence, it had to: (1) identify all significant mitigating and aggravating circumstances; (2) state the specific reason why each circumstance was determined to be mitigating or aggravating; and (3) articulate the trial court's evaluation and balancing of the identified circumstances. *Id.* "'[A] single aggravating circumstance [was] enough to justify an enhancement or the imposition of consecutive sentences,'" and this Court would only have remanded for resentencing if we could not say "with confidence that the trial court would have imposed the same sentence if it considered the proper aggravating and mitigating circumstances." *McCann*, 749 N.E.2d at 1121. When a trial court improperly applied an aggravator but other aggravating circumstances existed, our supreme court would uphold a sentence enhancement. *Garland v. State*, 855 N.E.2d 703, 707 (Ind. Ct. App. 2006) (citing *Smith v. State*, 770 N.E.2d 818, 822 (Ind. 2002)), *trans. denied*.

[40] Even if we found that the five aggravating factors the trial court adopted here were improper, the jury found that there were thirty-eight total aggravating factors. As Sharp has not challenged the remaining thirty-three aggravators the jury found, we conclude that he was not prejudiced by his trial counsel's failure to object to any of the statutory aggravators that the trial court adopted. Accordingly, Sharp did not show that his appellate counsel was ineffective for

failing to raise trial counsel's failure to object to the aggravators as an issue on appeal.

## 2. Competent Presentation of Issues

Finally, Sharp argues that his appellate counsel was ineffective because he failed to present issues competently. He notes that his appellate counsel's ineffective assistance of trial counsel claim lacked merit because, as we held on appeal, it was collaterally estopped by the prior litigation. Sharp claims that he was prejudiced by this meritless claim because it precluded him from raising better ineffective assistance of trial counsel claims in his petition for post-conviction relief. He also contends that the post-conviction court erred by failing to address this argument in its findings of fact and conclusions thereon.

Under the third category of appellate ineffectiveness, a petitioner may allege that, although his counsel raised particular issues, counsel's presentation of them was inadequate in some way. *Bieghler*, 690 N.E.2d at 195. This category includes actions such as filing an inadequate appellate brief. *Id*. Sometimes, "appellate counsel's work is so deficient that an issue, though technically raised, is deemed waived for failure to present cogent argument and/or cite to facts in the record supporting the claim." *Id*. In other cases, however, the reviewing court is still able to reach the issue on its merits, even though counsel's presentation of it was less than stellar. *Id*.

[43] First, we disagree with Sharp's contention that the post-conviction court failed to rule on this argument. In its order, the post-conviction court concluded:

> 201. The Court acknowledges that the brief of appellate counsel was weak. He did not develop his arguments well and he "fell into" making an ineffective assistance of counsel claim[] that should have been preserved for [post-conviction] [r]elief.
>
> 202. That being said, this Court finds that Petitioner has failed to meet his burden with regard to ineffective assistance of appellate counsel.
>
> 203. The Court further finds and concludes that trial counsel was not ineffective pursuant to *Strickland*.
>
> 204. The above-referenced, unraised issues were not significant and obvious from the face of the record, and these issues are not clearly stronger than the raised issues. Therefore, [a]ppellate [c]ounsel was not ineffective.
>
> Additionally, the Petitioner has failed to prove prejudice. . . .

(App. 63-64). The post-conviction court clearly addressed Sharp's argument in this excerpt.

[44] Second, we agree with the substance of the post-conviction court's conclusions. Even if Sharp's appellate counsel's brief was weak, Sharp has not demonstrated that he was prejudiced as a result. We have not found that any of the ineffective assistance of trial counsel claims Sharp has raised had more merit than the claims Sharp's appellate counsel raised on appeal. Accordingly, we conclude that the results of Sharp's appeal would not have been different if his appellate counsel had presented his issues differently, and, therefore, Sharp

failed to prove prejudice sufficient to prevail on an ineffective assistance of counsel claim.

Affirmed.

Crone, J., and Brown, J., concur.